UNITED STATES of America,
Plaintiff–Appellee,

Tulalip Tribe,
Plaintiff–Intervenor–Appellee,

v.

LUMMI INDIAN TRIBE,
Plaintiff–Intervenor–Appellant.

No. 86–3664.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 1987.

Decided March 9, 1988.

Daniel A. Raas and Harry L. Johnsen, Bellingham, Wash., for plaintiff-intervenor-appellant.

John T. Stahr, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Mason D. Morisset, Seattle, Wash., for plaintiff-intervenor-appellee.

Before BEEZER and HALL,* Circuit Judges, and GRAY,** Senior District Judge.

BEEZER, Circuit Judge:

The Lummi Indian Tribe appeals from a judgment holding that in 1855 certain waters in the northern part of Puget Sound were usual and accustomed fishing grounds of the Tulalip Tribes. We affirm.

I

The United States and various tribes, including predecessors to the Lummi and Tulalip Tribes, entered into the Treaty of Elliott Point in 1855. Article V of the Treaty reserves to signatory tribes "[t]he right of taking fish at usual and accustomed grounds and stations ... in common

---

* Judge Hall was drawn to replace Judge Kennedy. She has read the briefs, reviewed the record, and listened to the tape of oral argument held on September 10, 1987.

** The Honorable William P. Gray, Senior District Judge for the Central District of California, sitting by designation.

with all citizens of the Territory...." 12 Stat. 927, 928.

In 1975 we affirmed the decision of United States District Judge Boldt that Treaty tribes may take up to 50% of available harvest at their traditional grounds and stations. *United States v. State of Washington*, 520 F.2d 676, 683 (9th Cir.1975), *aff'g* 384 F.Supp. 312 (W.D.Wash.1974) ("The Boldt Decision"), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). Determination of usual and accustomed fishing grounds of the many tribes involved was left to subsequent proceedings.

Predecessors to the Tulalip Tribes ("Tulalips") historically inhabited lands north and east of the Seattle metropolitan area. Predecessors to the Lummi Tribe ("Lummi") inhabited portions of the San Juan Islands in northern Puget Sound. In 1975 the district court provisionally determined the extent of the Tulalips' usual and accustomed fishing grounds. *United States v. State of Washington*, 459 F.Supp. 1020, 1058–60 (W.D.Wash.1978). The district court relied primarily on the testimony of Dr. Barbara Lane, an anthropologist, and on the testimony of Harriet Dover, a Tulalip elder. *Id.*

The Tulalips initiated this action for a determination that their usual and accustomed grounds at the time of the treaty included waters not included in the provisional adjudication. The waters at issue are 1) Point Roberts, Birch Bay and adjacent waters, 2) waters of the San Juan Islands and the straits on either side of the San Juan Islands (Haro and Rosario), and 3) waters off the west coast of Whidbey Island. Other tribes, including the Lummi, traditionally fished these waters. The Lummi Tribe and 10 other tribes intervened in the proceeding. All tribes except the Lummi settled with the Tulalips before trial.

The district court referred the case to a special master. The special master considered testimony of several Tulalip elders, Dr. Lane, and Dr. Snyder, an anthropologist who had interviewed between 25 and 30 Tulalip "informants" in 1950. The Lummi sought to introduce testimony of their own expert, Dr. Onat. The Lummi, however, had failed to include Dr. Onat on the list of witnesses required by the pretrial order, and the district court did not allow Dr. Onat to testify. The special master determined that the evidence supported the Tulalips' claims; the district court adopted the master's report. The Lummi Tribe appeals.

## II

■ The Boldt Decision defined "usual and accustomed" fishing grounds and stations as "every fishing location where members of a tribe customarily fished from time to time at and before treaty times, however distant from the then usual habitat of the tribe, and whether or not other tribes then also fished in the same waters." The Boldt Decision, 384 F.Supp. at 332. Trolling incidental to travel did not establish an area as a usual and accustomed fishing ground. *Id.* at 353. Except for specific fishing stations, such as reef net sites and halibut banks, a tribe's right to fish usual and accustomed grounds is held in common with other tribes whose usual and accustomed fishing grounds include the same water.

The burden is on the petitioning tribe to produce evidence that disputed waters were usual and accustomed fishing grounds. *United States v. State of Washington*, 459 F.Supp. at 1059. "Grounds" refers to "larger areas which may contain numerous stations and other unspecified locations which ... could not then have been determined with specific precision and cannot now be so determined." The Boldt Decision, 384 F.Supp. at 332.

Documentation of Indian fishing during treaty times is scarce. Dr. Lane, an acknowledged authority in the field, has testified that what little documentation does exist is "extremely fragmentary and just happenstance." Accordingly, the stringent standard of proof that operates in ordinary civil proceedings is relaxed. *United States v. State of Washington* ("Makah"), 730 F.2d 1314, 1317 (9th Cir.1984).

We review for clear error the district court's findings of historical fact concerning Indian fishing. *Id.* Whether, given these facts, disputed waters were usual and accustomed fishing grounds is a mixed question of law and fact, which we review *de novo. Id.*

Credibility of witnesses is a quintessentially factual determination which will not be disturbed in the absence of clear error. *United States v. McConney,* 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), citing *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse. *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

### A. *Point Roberts, Birch Bay and Adjacent Waters*

The district court found that the Tulalips "frequently traveled to the Fraser River for trading of both salmon and furs" and that "[d]uring such travels they would have harvested salmon accessible to them." *United States v. State of Washington,* 626 F.Supp. 1405, 1529 (W.D.Wash.1985). Records of the Hudson's Bay Company, the ship Queen Anne, and John Work's Journal all establish Tulalip presence in the Point Roberts and Birch Bay area. The 1895 affidavit of Lummi fisherman Harry Sewalton demonstrates that the "Tulalips and other tribes of the state and territory of Washington annually fished at [Point Roberts]" and that such fishing had occurred "at all times since his boyhood." Sewalton was born about 1830. Another 1895 affidavit, that of Lummi fisherman Joe Tobe, shows that the "Tulalips … and other tribes annually gathered at [Point Roberts] and camped on the beach and had thirty or forty shacks, cabins and buildings for drying fish." Additional elder testimony indicates that the Tulalips had fished as far north as Canada during the relevant period. *See* testimony of Joe Jimicum.

### B. *The San Juan Islands*

Dr. Snyder testified that the Tulalips traveled to the San Juan Islands to fish in order to add to their winter stores. Depopulation of the San Juan Islands in the early 1800s due to disease and tribal warfare left the islands and their resources available for use by neighboring tribes. Hudson's Bay Company records confirm Tulalip presence in the San Juan Islands during treaty times, and a British military expedition reported significant numbers of Tulalip in the area. Several tribal elders testified that the Tulalips traveled to the San Juan Islands to fish. Although elder testimony is not the most accurate, documentary evidence of substantial Tulalip presence in the San Juan Islands corroborates the elders' testimony (and Dr. Snyder's opinion) that the Tulalips regularly fished in the San Juan Islands.

### C. *West Coast of Whidbey Island*

The Lummi concede that the Tulalips traditionally fished the southerly portion of the west coast of Whidbey Island. Beyond noting that "undoubtedly" Tulalip ancestors "fish[ed] on the west coast of Whidbey Island," Dr. Lane was not willing to draw a conclusion concerning the precise location of Tulalip fishing in the open waters off of Whidbey Island because of the lack of specific documentation. Dr. Lane noted that records of marine fishing are almost nonexistent and that, with the exception of specific salmon and halibut banks, the open waters of Puget Sound were available to any tribe for fishing. Tulalip elders testified that their ancestors circumnavigated Whidbey Island for the purpose of fishing.

Given 1) evidence of Tulalip fishing on Whidbey Island, 2) the communal nature of

Indian marine fishing, and 3) documentary evidence that the Tulalips fished the San Juan Islands and as far north as Point Roberts, it is reasonable to conclude that the Tulalips also fished the nearby waters off the west coast of Whidbey Island. The record nowhere suggests a competing inference that Tulalip predecessors did not fish the entire west coast of Whidbey Island.[1]

Evidence of frequent fishing in the disputed areas is stronger in this case than in the Makah case, *United States v. State of Washington*, 730 F.2d 1314. The Makah Tribe had requested a determination that their usual and accustomed fishery included marine waters extending 100 miles off the western coast of the Olympic Peninsula near the Canadian border. The Makah presented evidence that they traveled as far as 100 miles off shore at treaty times and that whaling or exploration might have been reasons for the journeys. The Special Master determined that the Makah's usual and accustomed fishing grounds extended 100 miles from shore. The district court rejected the master's conclusion and reduced the area to 40 miles from shore. Reviewing the district court's decision *de novo*, we concluded that "[t]here is no basis for an inference that [the Makah] customarily fished as far as 100 miles from shore at treaty time." *Id.* at 1318. By contrast, evidence in this case readily supports an inference that the Tulalips frequently fished the disputed areas.

Finally, the record indicates that the Tulalips traveled regularly and extensively in Puget Sound, around the San Juan Islands, and up the west coast of Whidbey Island. While travel through an area and incidental trolling are not sufficient to establish an area as a usual and accustomed fishing ground, *see* The Boldt Decision, 384 F.Supp. at 353, *frequent* travel and visits to trading posts may support other testimony that a tribe regularly fished certain waters. As Dr. Lane said, "[I]t is clear that in common with the other coastal people [the Tulalips] were accustomed to trav-el widely in their canoes and to harvest such fish as were accessible to them."

In light of the foregoing, the district court's findings concerning fishing practices of the Tulalips near Point Roberts, Birch Bay, the San Juan Islands, and the northern portion of the west coast of Whidbey Island are not clearly erroneous. On the basis of its findings the district court properly determined that the disputed areas were usual and accustomed fishing grounds of the Tulalips.

### III

Federal Rule of Civil Procedure 16(e) provides that the pretrial order

shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

Fed.R.Civ.P. 16(e). The trial judge may exclude evidence not identified in accordance with the pretrial order when the party seeking to introduce the evidence offers no justification for delay. *Colvin v. United States*, 549 F.2d 1338, 1340 (9th Cir.1977). In such a case, "[a]ny injustice resulting from exclusion ... comes from [the defaulting party's] own failure properly to present his case." *Id.*

In this case the district court lodged its pretrial order on December 17, 1982. The order set March 7, 1983 as the deadline for identifying witnesses, and the Tulalips granted a one week extension at the request of opposing tribes who had not yet settled with the Tulalips. Trial was set for July 11, 1983.

On June 23, 1983, the Lummi Tribe informed the Tulalips over the telephone of the Lummi's intent to call Dr. Onat as an expert witness on traditional Tulalip fishing grounds. The Tulalips moved to exclude Dr. Onat from trial, and the special master granted the motion.

The Lummi advance no justification for their failure to include Dr. Onat in their list of witnesses as required by the pretrial

---

**1.** In support of their argument that the Tulalips did not fish the northern portion of the west coast of Whidbey Island, the Lummis inappro-priately rely on expert testimony concerning the *east* coast of Whidbey Island.

order. Instead, the Lummi contend that they should have been allowed to present Dr. Onat because the Tulalips suffered no prejudice. This rationale would allow parties to frustrate the salutary purposes of pretrial conferences and excuse parties who disregard court orders. The special master did not abuse his discretion in excluding Dr. Onat from testifying at trial.

## IV

Evidence concerning Indian fishing in treaty times is sketchy and less satisfactory than evidence available in the typical civil proceeding. As Judge Boldt noted, "In determining usual and accustomed fishing places the court cannot follow stringent proof standards because to do so would likely preclude a finding of any such fishing areas." 459 F.Supp. at 1059. Upon review of the entire record, we cannot say that a mistake has been made. *See Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511. Findings supporting the judgment are not clearly erroneous, and the district court applied correct legal standards to determine whether waters at issue were usual and accustomed fishing grounds for the Tulalips at the time of the treaty of Elliott Point. Finally, the special master properly excluded Dr. Onat from testifying at trial.

AFFIRMED.