Mr. Justice NELSON
delivered the opinion of the court.
This case has already been twice before the court.* It was very ably and elaborately argued at the bar on both occasions, and fully considered by the court. There is very little, if anything, left'that is new to be considered or decided upon the present argument.
The main question in contestation in the two preceding arguments, and which has again been ably and elaborately presented, is that involved in the settlement of the southern boundary of the grant, whether or not the foot of the Sierra, the mountain range, or the Lomas Bajas, a range of low hills north of it, constituted this southern boundary. The Board *707 of Commissioners adopted the Sierra, and its decree, in this respect, was' confirmed by the District Court. On an appeal to this court the same line was fully recognized.
The court, after referring to the lines of the grant.to. Larios, and to the Sierra, as described in the grant to Ber-reyesa, the west line of which was a line in common between the two ranches, as agreed upon between the parties previous to the issue of either grant by the Governor, say, “ The southern, western, and eastern boundaries of the land.granted to Larios are well defined, and the objects exist by which those limits can be ascertained. There is' - no call in the grant for' a northern boundary, nor is there any reference to the diseño for any natural object, or other descriptive call to ascertain it. The grant itself furnishes no other criterion for determining that boundary than the limitation of quantity, as expressed in the third condition.” The decree of the District Court was reversed, for the reason that it confirmed to the claimant a larger quantity of land than was embraced in the grant, and the cause was remitted to that court to enter a decree in conformity with the opinion. As it became necessary to remand the cause for the purpose of locating upon the ground the quantity as limited by the above decision, authority was given to the District Court to fix the' boundaries from the evidence on file, and such other evidence as might be produced before it. On filing the mandate in the District Court, the- counsel for the United States applied for liberty to furnish further evidence, which application Avas granted. Several witnesses were examined accordingly, their testimony relating chiefly to the southern boundary of the tract, as described in the grant. Tlie court had suspended the entry of the decree, in pursuance of the mandate, until after this evidence was furnished. The decree Avas filed and entered October 18, 1858. It reaffirmed the Sierra, or mountain range, as the southern boundary, and directed the line to be so drawn as to include the bottom and low lands along the base of this Sierra, and declared the eastei’n line to be a straight line commencing at the junction of the Arroyo Seco and the Arroyo de Alamitos, and thence' *708 running southward to the aforesaid Sierra, or mountain range, passing by the eastern point of the small hill situated in the centre of the cañada, which was designated in the grants to Larios and Berreyesa, being the same line agreed upon between them as a division-line, and which is delineated by a dotted line on the diseño or map in the expediente of Berreyesa. It declares also the western boundary to be the Arroyo Seco, which is the continuation of a stream known .as the Arroyo Capitán cilios, and the northern boundary to be a line or lines located, at the election of the grantee, or his assigns, under the restrictions established for the location and survey of private land claims in California, in such manner that, between the northern, southern, eastern, and western lines, there shall be contained one league of land, and no more.
The decree then fixes the western line of Fossat, which is a line between him and the Guadalupe Mining Company, 'that, owns one-fourth of the league granted to Larios, and confirms to Fossat the remaining three-fourths within the lines above declared.
This decree was appealed from by the United States to this court.* The court dismissed the appeal as prematurely brought, the decree below not being a final decree.
In the opinion dismissing the appeal, it is said, after referring to the case when previously before us,† “ The court had determined that the grant under which the plaintiff claimed land in California was valid for one league, to be taken within the southern, western, and eastern boundaries desig nated therein, at the election of the grantee and his assigns, and adds, the District Court, in conformity with the directions of the decree, declared the external lines on three sides of the tract claimed, leaving the other line to be completed by a survey to be made.. From the decree, in this form, the United States have appealed.”
The court then answers the objections taken to the motion *709 to dismiss, which were, that the inquiries and decrees of the Board of Land Commissioners and of the District Court could relate only to the question of the validity of the claim, and not to questions of location, extent, and boundary, and that the District Court had gone in its decree to the full limit of its jurisdiction. These objections, after a full consideration of the acts of Congress, of adjudged cases, and of the principles upon which the court was bound to proceed, were overruled; and the court observe that, in addition to the questions upon the validity of the title, there may arise questions of extent, quantity, location,- boundary, and legal ope^ ration, that are equally essential in determining the validity of the claim; and that, in affirming a claim to land under the Spanish or Mexican grants to be valid within the law of nations, the stipulations of the treaty of Guadalupe Hidalgo, and the usages of these governments, we imply something more than that certain papers are genuine, legal, and trans-lative of property. We affirm ownership and possession of land of definite boundaries rightfully attach to the grantee. And in closing the opinion, it is observed that, “After the authenticity of the grant is ascertained in this court, and a reference has been made to the District Court to determine the external bounds of the grant, in order that the final confirmation may be made, we cannot understand upon what principle an appeal can be claimed until the whole of the 'directions of this court are complied with, and that decree made. It would lead to vexatious and unjust delays to sanction such a practice.”
It will be seen, from this opinion, that the reasons for the conclusion that the decree of the District'Court was not a final one, were, that the land granted had not been located on the ground by fixed and definite boundaries. A survey of the tract was indispensable in order to locate the northern boundary. That boundary was not given in the descriptive calls of the grant, and depended upon the limitation of the quantity; and until the survey of the three lines given, namely, the eastern, southern, and western, and the three-fourths of a league of land located within them, the northern *710 boundary could not be ascertained or fixed. The location of this line was an essential step to be taken on the part of the District Court, in fulfilment of the duty enjoined by the mandate of this court. In the interpretation of that mandate, this court, in its opinion,* observes, “ The District Court, in conformity with the directions of the decree, declared the external lines on three sides of the tract claimed, leaving the other line to be completed by a survey to be made.” That had not been done.
On the filing of the mandate of dismissal of the appeal in the District Court, an-order'was made directing-the Surveyor-General to proceed and*survey the land confirmed in conformity with the decree as entered in that court, and which, as we have seen, was entered on the 18th October, 1858.' That survey was made and is found in the recoi’d. It was approved by the Surveyor-General 18th December, 1860, and filed in the court below 22d January, 1861. Ve have also the testimony of Hays, the-deputy surveyor, who surveyed the lines'on the ground, and constructed the map; also of Conway, a clerk in the office, who assisted him, and of Mandeville, the Surveyor-General, who approved of the map, showing that the survey and map were made in strict conformity with the boundaries of the tract as given in the decree, of which they had a copy, and followed as their guide.
This survey having been made in conformity with the decree ■ of the District Court, entered in pursuance' of our mandate, would, doubtless, have closed this controversy, had it not been for the act of Congress passed 14th June, 1860, after the entry of the decree in the District Court, but before the survey of the tract by the Surveyor-General. The act purports to be an act to regulate the jurisdiction of the District'Courts of the United States in California,-in regard to the survey .and location of confirmed private land claims. It authorizes the court to allow intervenors, not parties to the record, to appear and contest the survey, or in the words *711 of the act, “ to show the true and proper location of the claim,” and for that purpose to produce evidence before the court, and directs that, “ on the proofs and allegations, the court shall render judgment thereon.” Any party dissatisfied with the decision may appeal to this court within the period of six months.
Under this act several parties intervened, and much testimony was furnished to the court in relation to the survey and location of the tract by the Surveyor-General, and which is .found in the record, embracing some two hundred and twenty pages. And on the 16th November, 1861, the court entered an order reforming the survey, as to, the eastern line. Instead of adopting the eastern lino of the' survey, which had been located as directed in its decree, and which was a straight line from the point of beginning to the termination at the Sierra (the southern boundary), passing by the eastern point or base of the low hill in the centre of the cañada, the court directed that, from the base of the low hill, the line south should be deflected fifty-five degrees west, until it reached a given point or object, and from thence south thirty-four degrees west till it reached the Sierra, or mountain range. Instead of a straight line for the eastern boundary, three lines were directed to be rim, at considerable angles to each other, between the starting-point and the termination. This direction of the court not only reformed tho survey of the tract as made by the Surveyor-General, but reformed the decree itself of the court,'entered on the 18th October, 1858, in pursuance of which the survey had been made. The court assumed that the survey and location of the tract was not to be governed by the decree, but, on the contrary, that it was open to the court to revise, alter, and change it at discretion, and to require the Surveyor-General to conform his survey and location to any new or amended decree; for, certainly, if it was competent to change this eastern line from that settled in the decree, it was equally competent for it to change every other line or boundary as there described and fixed.
Now, it must'be remembered, that this decree of the Dis *712 trict Court designating with great exactness this eastern line, with, such'exactness that the Surveyor-General had no difficulty in its location, was entered in pursuance of, and in accordance with, the pian date of this court, and by which that court was instructed at' the time of the dismissal of the appeal, that the three external lines declared in it were in conformity with the opinion of this court; and that the other line — the north line — only, remained to be completed by a survey to be made, and that this line was to be governed by quantity, which quantity had been previously determined.
This radical change, therefore, of the eastern line of the tract, involves something more than a change by the court of its own decree; it is the change of a decree entered in conformity with the mandate of this court. But we do not intend to place any particular stress upon this view, for we hold that it is not competent for the court to depart from its own decree in the exercise of the power conferred by the act of the 14th June, 1860. The duty enjoined is not a rehearing of the decree on its merits, it is to execute it, to fix the lines on the ground in conformity with the decree entered in the case. The decree is not only the foundation of the validity of the grant, but of the proceedings in the survey and location of land'confirmed. But,'independently of this view, which we regard as conclusive, and even if the question was an open one, this alteration is wholly unsustainable. Indeed, the learned counsel for the appellees did not undertake to sustain it on the argument. The fact was admitted hat the line was a straight one between the two termini.
' An attempt, however, was made to sustain the termination of the line at the same point on the Sierra, or southern boundary, consistent with the line being run straight from the point of starting. This is sought to be accomplished by disregarding one of the descriptive calls in the line, a natural object, namely, the eastern base of the low hill, an object which must'have been visible to the eyes of both Barios and Berreyesa at the time they agreed upon the settlement of the line as their common boundary. But even this departure from the grant will not answer the purpose. There is *713 still the difficulty of getting at the point of termination at the foot of the Sierra. That point or corner must-first be ascertained before a straight line can. be extended to it from the junction of the two creeks, the starting-point. The only description in the grant by which this point of termination can be ascertained is'by running a line from the junction of the two creeks past the eastern base of the low hill southward to the Sierra. It is the extension of this line, in the manner described, by "which this corner on. the Sierra is reached ..and identified. Any one seeking to ascertain it without the use of these means, will find himself without compass or guide.
Now, this corner the learned counsel for the appellees propose to fix arbitrarily or by conjecture, and "then by drawing a line from the junction of the two creeks to it, a straight line is obtained, .and by this process of ascertaining the corner at the Sierra, it is made easy to select the one reached by the crooked line of the court below. But then, the line, as is admitted, instead of passing by the eastern base of the low hill, would cut it not far from or even west of its centre.
The court below, as is apparent, yielded to this argument, so far as respected the arbitrary selection of the .'.corner at the Sierra-, but refused to depart from the call i rutilé line for" the eastern point of the low hill. Hence, the crooked line between that point and the termination. The crooked, line has the advantage over the straight one of the learned coun-' sel, ás it observes one of the principal calls -in. the. grant. Theirs observes none of them except the starting-point.
There are two objections to this view, either of which is fatal. _•
The first, the point selected at the foot of the Sierra for a corner, is arbitrary and conjectural, and in contradiction to the clear description in the .grant.- And, second, it disregards one of the principal and most controlling calls in it, the eastern base of the low hill.
Our conclusion upon this branch of the" case is, first, that the court erred in departing from the eastern boundary, as *714 specifically described ,and fixed in the decree of the 18th October, 1858. And, second, that irrespective of that decree, the line in the survey and location approved by the Surveyor-General, 18th December, 1860, is the true eastern line of the land confirmed.
The only party that appealed from this order or decree of the District Court, in respect to the survey and location, as appears from the record, is the present claimant. He insists upon the correctness of the first survey by the Surveyor-General, and that the alteration by the court of the eastern line, and consequently of the other lines made necessary by this change, are erroneous.
• The United States did not appeal. They are, however, a-party to the record as appellees, and appeared by counsel on the argument in this court, and took objections to the survey and location, mainly on the ground that .the proceedings under the act of 1860 were not judicial, but purely executive and ministerial, and, ás a consequence, that the appeal from the order or decree of the' District Court, regulating the survey and location, ought not to be entertained;' that the courts could only determine the validity of the grant, leaving its survey and location to the Executive Department of the Government. In other words, that the act of 1860 was unconstitutional and void. We need only refer to the opinion of this court, in the present case, the second time it was before us, as presenting a conclusive refutation of these several positions. The fundamental error in the argument is, in assuming that the survey and location of the land confirmed are not peoeeedings under the control of the court rendering the decree, and hence not a part of the judicial action of the court. These proceedings are simply in execution of the decree, which execution is as much the duty of the court, and as much within its competency, as the hearing of the cause and the rendition of its judgment; as much so as the execution of any other judgment or decree rendered ' by the court.
This .power has been exercised by the court ever since the *715 Spanish and French land claims were placed under its jurisdiction, as may be seen by the cases referred to in the opinion of the court in this case, when last before us,* and in many others to be found in the reports. The powers of the Surveyor-General under these • acts were as extensive and as well defined as under the act of 1851. The act of 1860 did not enlarge or in any way affect his powers. They remained the same- as before.
The first act of Congress, March 2d, 1805,† amended March 8d, 1806, establishing a Board of Commissioners -to settle private French and Spanish land claims, under the Louisiana-treaty, provided for a survey of the confirmed tract by the Surveyor-General, under the direction of.the commissioners.
And the act of 26th March, 1824, the first act which placed these land claims under the jurisdiction of the United States' District Courts, provided that a copy of the decree- of.the confirmed claim should be delivered to the Surveyor-General, and that he should cause the land specified, in-the decree to be surveyed, and which survey, being presented to the Commissioner of the Land Office by the claimant, entitled him'to a patent. Under this act and other similar acts, the cases referred to in 21 Howard arose, and in. which this court entertained appeals from decrees in the .District Coui’ts upon the survey and location of confirmed claims. The 13th section of the act of 1851 corresponds substantially.with the above - provision of the act of 1824. It makes it the duty of-the Surveyor-General to cause all confirmed claims to be accurately surveyed, and provides that the claimant, on presenting a copy of the decree of confirmation and a plat of survey to the General Land Office, a patent shall issue. It also confers upon this officer the powers of the registers and receivers, under the 5th section of the act of March 3d,-1831,‡ which relates simply to the case of interfering confirmed claims.
*716 The duty of the Surveyor-General, under all these acts, is to survey and locate the confirmed tract, in conformity with the decree. It is the only guide which is furnished to him; and. one of the first instructions from the Land Office is as follows: “In the survey of finally confirmed claims you must be strictly governed by the decr.eemf confirmation; and when the terms of such decree are specific, they must be exactly observed in fixing the locality of and surveying the claim.” This instruction was given under the act of 1851, and in relation to the private land claims of California; and it,was in accordance with this instruction that the survey of the present claim was made and approved by the Surveyor-General, 20th December, 1860, and filed in the court below 22d January following, and'which was reformed by the court by the alteration of the eastern line, as already explained. Those who are desirous of putting the Land Office above the decrees of the courts, should at least be satisfied with this instruction of the department, if not with the decrees.
It has been argued, that the lines of the tract, as given in the grant, were out-boundaries, like the case of Fremont and others which have been before the court, and embraced a larger area of land than the one square league, and that the survey and location should not have been controlled by these lines as specific boundaries.
The first answer to this objection is, admitting it to be true, it can have no influence upon the judgment to be given by this court. These lines have been adjudicated and settled, and incorporated in the decree of the District Court, and which decree was entered in pursuance of the mandate of this court, and no appeal has been taken from that decree. It is said, however, that the decree was not in conformity with the mandate. If so, the party aggrieved should have appealed, and this court would have corrected the error. This is common learning, and needs no authority.
The error, it -would seem, was not discovered until the survey; but this affords no reason for violating established law. The more natural conclusion, we think, is that the *717 omission to appeal was the result of a conviction the decree was right. It was entered after.much testimony taken in respect to it, and full argument on behalf of the very parties who now set up this pretext.
The second answer to the objection is, that the lines in the grant arc not out-boundaries in the sense of the cases referred to.
This court said, when the case was first before it, “ The southern, western, and eastern boundaries of the land granted to Larios are well defined, and the objects exist by which these limits can be ascertained. There is no call in the grant for a northern boundary, nor is there any reference to the diseño for any natural object, or other descriptive call to ascertain it. The grant furnishes no other criterion for determining that boundary than the limitation of the quantity as expressed in the third condition.” And the same opinion is substantially expressed by the court when before it the second time. The court say: “ The District Court, in conformity with the directions of the decree, declared the external lines on three sides of the tract claimed, leaving the other lin'e to be completed by a survey to be made.” It should be remembered this was said of the decree now in question, which was then before the court. The observations wore made in express reference to it.
But, independently of this, and looking at the question as au original one, there can be no reasonable doubt about it. The eastern line was in dispute between the two adjoining rancheros (Larios and Berreyesa), and which was carried before the public authorities for settlement, and there finally adjusted by the agreement of the parties. A line could hardly be made more specific. A boundary settled and fixed after litigation by the adjoining owners. The western boundary is a. well-known natural object, the Arroyo Seco — a creek. The southern, the Sierra, or mountain range; and no boundary on the north. The grant was of quantity, and of necessity'this boundary must be determined by the limitation of that quantity between the lines given. *718 It is true, in the second condition of the grant it is said, the judge who shall give possession of the land shall have it measured in conformity to law, leaving the sobrante, the surplus, to the nation. But this is a formal condition, to be found, for abundant caution, in every Mexican grant. There is no sobrante here, nor .could the judge have measured the grant according' to the law or ordinance in a way to have any. Aside, therefore, from the lines being fixed and specific according to the opinion of this court, and of the decree of the court below in pursuance of it, there could be no l’easonable doubt upon the question, if-an original one.
Much has been said on the argument in respect to the first locations and residences of the claimants on the low lands outside of this northern boundary, and as to the duty of the court to so locate this boundary as to include these possessions. But the. answer to these suggestions is obvious. At the time' these claimants- took possession of the tract, they supposed they were entitled to- a larger quantity of land than one league, — nearly two leagues, — which would have carried this line over and beyond these possessions. But this court cut' down the quantity to one league, and hence these possessions - are, with the exception of the old house of Barios, necessarily excluded. ■ It is- also said that sales were made to third persons in the Valley outside of the line, :and that their'title should be protected. But they are not complaining of tlie survey or location as made.in pursuance of the decree. Some of them appeared before the District. Court, and filed-objections to it, but have”since withdrawn and abandoned them. We do not refer-to these objections as entitled to any particular weight or impoi’tance, but because 'the explanations are at hand, for we place the decision of the case upon the ground that the boundaries of the tract have' been settled by the final decree of a'court of competent jurisdiction, and until that decision is got-rid of, there is an end of the controversy;
Our coNClusxqN is that the order or decree of the court below, of the 16th November, 1861, which set aside the sur *719 vey of the tract approved by the Surveyor-General, 18th December, 1860, and which, order or decree was directed to be filed mmepro tunc, as of the 31st October, 1861, and, also, the order or decree of the 16th November, 1861, confirming the new survey, which was filed in court by the Surveyor-General on 11th of that month, be reversed and annulled, and that the cause be remitted to the court below, with directions to that court to enter a decree .confirming the survey of the Surveyor-General, approved 18th December, 1860, and filed in court 22d January following.
The only objection that can be made to this survey is, that the tract is not located in a compact body. A comparatively small strip or tongue of land is extended from the main body along the eastern line north to the junction of the two creeks, with a view to reach the starting-point of the description in the grant. This was unnecessary, as we have seen, for the cutting down of the quantity to a league necessarily carried the north line further south than originally supposed. This northern line might have been closed with the eastez-n direct, instead of adopting the divergence north to.the junction of the two creeks. But the quantity of land embraced in this strip is unimportant, is of no interest to any one except the Government, and scarcely any to it, as, if corrected, an equal quantity must be taken to make out the quantity in the grant from some other part of the public lands. Besides, the Government has not appealed.
To remit the case with directions that a new survey be made in conformity with the decree, and for the purpose of correcting this small error, would occasion delay and expense, and benefit no one.
The truth is, since the determination that the southern boundary of' the tract was the Sierra, and not the Lomas Bajas, and that the eastern was a straight line, its direction southward to be controlled by the eastern base of the low hills, there-is nothing left of this controversy worth contending for — scarcely merit enough to make it respectable.
Decree reversed and the cause remitted, with directions *720 to enter a decree confirming the survey approved by Surveyor-General, 18th. December, 1860.

 United States v. Fossat, 20 Howard, 413; Same v. Same, 21 Id. 445.

 United States v. Fossat, 21 Howard, 445

 Reported 20 Howard, 413

 21 Howard, 447.

 21 Howard, 445.

 2 Stat. at Large, p. 441; §§ 6, 7.

 4 Stat at Large, 494.